

**FILED**

Aug 08 2023, 8:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Riley L. Parr
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kurt Russell, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 8, 2023 <br><br> Court of Appeals Case No. 22A-CR-2299 <br><br> Appeal from the Boone Superior Court <br><br> The Honorable Matthew Kincaid, Judge <br><br> Trial Court Cause No. 06D01-2101-F1-000074 |

**Opinion by Judge May**
Judges Mathias and Bradford concur.

**May, Judge.**

Kurt Russell appeals his conviction of Level 1 felony dealing in a controlled substance resulting in death.[1] He raises two issues, which we revise and restate as:

> 1. whether the trial court abused its discretion by admitting evidence found on a cell phone; and
>
> 2. whether the trial court erred in denying Russell's motion for a directed verdict because the State failed to present sufficient evidence to prove that Russell committed the crime charged.

We affirm.

## Facts and Procedural History

Maxwell Timbrook and Russell met when they both worked at a Costco store in Indianapolis, and they became friends. They exchanged hundreds of text messages, and their text conversations primarily concerned the acquisition and use of heroin and other narcotics. On January 16, 2020, Timbrook texted Russell: "Let's get some pie[.]" (Ex. Vol. I at 107.) "Pie" was a code word Timbrook and Russell used for heroin. (Tr. Vol. III at 45.) On January 17, 2020, Russell texted Timbrook to make sure Timbrook was still interested in getting drugs from Russell's supplier, and Timbrook confirmed that he

---

[1] Ind. Code § 35-42-1-1.5(a) (2019).

remained interested.  Russell responded: "Ill let u k now when I hear back from him."  (Ex. Vol. I at 109) (errors in original).  Russell explained the supplier would only accept payment in the form of cash on delivery, and he stated the supplier would only deliver the drugs if the supplier could make a substantial profit.

[3]  Russell initially told Timbrook the supplier would deliver the drugs by 9:15 p.m. on January 17, 2020, and Timbrook drove to an area near Russell's home on the northwest side of Indianapolis.  When the supplier did not arrive on time, Timbrook texted Russell: "Heading back home[.]"  (*Id*. at 111.)  Russell responded: "He says hes running a bit behind but[.]"  (*Id*.) (errors in original).  About twenty minutes later, Russell texted: "Just talked to him.  1030.  So he'll b out here 4 sure if u want to leave ur cash.  It wont be long."  (*Id*.) (errors in original).  Timbrook continued to text Russell with complaints about the supplier's timeliness, and Russell responded: "He never gives me an exact time if hes not gonna hold to it."  (*Id*. at 112) (errors in original).  When Timbrook's complaints persisted, Russell stated: "I'm doing you a favor man.  Tbh I could care less.  Just chill for a few more dude."  (*Id*. at 113) (errors in original).

[4]  Between approximately 11:00 p.m. and 12:35 a.m., Russell and Timbrook had the following text exchange:[2]

---

[2] The surnames of Russell and Timbrook have been substituted for their initials.

[Russell:] Hea pulling up bro

[Timbrook:] K

[Russell:] Alright come on

[Timbrook:] K

[Timbrook:] Here

[Timbrook:] So this is 40 worth

[Timbrook:] So just gimme 60 tomorrow and well call it even

[Russell:] Go easy man.  Stuff is wicked strong.

[Russell:] N/c on the skool busses.[3]  I felt bad for y so on house tonite.

[Russell:] Sttaight down the middle on the other tho like we agreed to earlier

[Timbrook:] Haha ok

[Timbrook:] Ya stuff is pretty good this time

---

[3] Detective Joshua Samuelson of the Zionsville Police Department testified that "school bus is a common term for Alprazolam or Xanax for the bars of them."  (Tr. Vol. III at 48.)

[Timbrook:] You smoke it or toot it

[Russell:] Shits the bomb.  Ill bring exttawill)ll)

[Timbrook:] right on

[Timbrook:] I think it's fentanyl

(*Id*. at 114-15) (errors in original) (footnote added).

On January 18, 2020, Jane Timbrook ("Jane"), Timbrook's mother, texted Timbrook a couple times in the morning, and she became worried when Timbrook did not respond to her texts.  Jane then called Timbrook's father, Bobby Timbrook ("Bobby").  Bobby was in Arizona at the time, but Timbrook lived in Bobby's Zionsville house.  Bobby told Jane he had not heard from Timbrook, and Jane drove to Bobby's house in Zionsville.  Jane then found Timbrook in the kitchen "doubled over on the floor with his face down."  (Tr. Vol. II at 154.)  Jane thought her son had overdosed, and she called 911.

Officer Joshua Rupp of the Zionsville Police Department was the first officer to arrive on the scene.  When Officer Rupp arrived, he saw Jane "frantically waiving her arms and yelling at [him] stating that her son was dead inside of possible overdose from a [sic] heroin."  (*Id*. at 130.)  Officer Rupp examined Timbrook's body and then requested a coroner and detectives.  Officer Rupp discovered cut up straws and a baggie with a yellow pill in it on the kitchen counter near Timbrook's body, and next to these items was a blue cylinder

typically utilized by drug users to grind pills and other substances. Subsequent lab testing found fentanyl present on one of the cut straws.

[7] Officer Rupp also found a cell phone on the counter near Timbrook's body with Timbrook's driver's license in a carrying case on the back of the phone. Detective Nicholas Johnson of the Zionsville Police Department also arrived on the scene and collected the cell phone found on the counter near Timbrook's body. Detective Johnson gave the phone to Detective David Sellers of the Whitestown Metropolitan Police Department to see if he could extract data from the phone. Detective Sellers was not able to extract much data from the phone because he did not know the passcode to open the phone, and Detective Johnson returned the phone to Bobby.

[8] Forensic pathologist Dr. Thomas Sozio performed an autopsy on Timbrook's body. Dr. Sozio did not identify any pathology that would explain Timbrook's death, and he left the autopsy open pending the results of a toxicology screen. After he reviewed those results, Dr. Sozio concluded four drugs contributed to Timbrook's cause of death: alprazolam, tramadol, trazadone, and fentanyl. Dr. Sozio found fentanyl was present in Timbrook's blood at three times the normal therapeutic level and the other three drugs were present at therapeutic levels.

[9] Bobby kept the phone found on the counter near Timbrook's body and a second, older phone that once belonged to Timbrook. A few weeks after Timbrook's death, Bobby remembered a passcode that Timbrook had told him. He charged both phones, and the two phones "opened up" when he entered the

passcode into them. (*Id.* at 181.) The data that Timbrook had stored in Apple's iCloud then "dumped on both of the phones." (*Id.* at 182.) Bobby went to the AT&T store "once [he] was able to get into the phone" in order "to make sure everything was going to be saved." (*Id.* at 186.) Bobby then delivered the second, older phone to Detective Johnson. Bobby did not delete any text messages or other data from the phone before giving it to Detective Johnson. Detective Johnson provided the phone to Detective Sellers, and Detective Sellers was able to extract Timbrook's text conversations and other data from the phone.

[10] On January 13, 2021, the State charged Russell with Level 1 felony dealing in a controlled substance resulting in death. The trial court held a jury trial beginning on August 8, 2022. Dr. Sozio testified the presence of fentanyl gave him "the most concern" in finding Timbrook's cause of death. (*Id.* at 225.) He explained:

> So, the three drugs … let's take the three drugs, alprazolam, tramadol, and trazadone. If only those drugs were present in Mr. Timbrook's blood that, I would not be able to say that was the cause of death.

(*Id.* at 231.)

[11] Russell objected to admission of the second, older cell phone and the text messages extracted from it. Russell argued admission of the phone ran afoul of Indiana Rule of Evidence 1002 and "the chain of custody was broken." (*Id.* at 235.) The State, in turn, asserted:

> The two phones were connected to Max's Apple ID, Apple
> Cloud, whatever and they were clones exact same of each other.
> Judge, it is a dump of, of the records pertaining to that phone
> number. Whether it's first phone, second phone, we don't think
> that matters.

(*Id*. at 236.) The trial court overruled Russell's objection. At the close of the State's case-in-chief, Russell moved for a directed verdict pursuant to Trial Rule 50, but the trial court denied Russell's motion. The jury returned a guilty verdict, and the trial court entered a judgment of conviction accordingly. On September 26, 2022, the trial court sentenced Russell to twenty-five years in the Indiana Department of Correction.

# Discussion and Decision

## 1. Admission of Text Messages

Russell first argues the trial court abused its discretion when it admitted the text messages extracted from the second phone. We review a trial court's decision on the admission of evidence for an abuse of discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. "A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law." *Id*.

Russell contends Indiana Rule of Evidence 1002 prohibited the State from introducing the data extracted from the second phone. "Generally, '[a]n original writing, recording, or photograph is required to prove its content' unless the Rules of Evidence or a statute provide otherwise." *Wise v. State*, 26

N.E.3d 137, 143 (Ind. Ct. App. 2015) (quoting Ind. Evid. R. 1002) (brackets in *Wise*), *trans. denied*. Nonetheless, "[a] duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Ind. Evid. R. 1003. For instance, in *Belcher v. State*, we held the trial court erred in admitting a duplicate document because "two major portions of the document" were obscured. 797 N.E.2d 307, 310 (Ind. Ct. App. 2003). Conversely, in *Hamilton v. State*, we held the trial court did not abuse its discretion in admitting a copy of a surveillance video recording rather than the original recording because the copy was the same as the original in all substantive respects and the defendant did not show that admission of the copy rather than the original was unfair to him. 182 N.E.3d 936, 939 (Ind. Ct. App. 2022). Likewise in *Wise*, we held that when a rape victim used a handheld camcorder to record videos she found on her rapist's phone, the handheld camcorder footage was admissible because the videos on the rapist's phone were lost at the time of trial and the handheld camera footage displayed no evidence of tampering or other alteration. 26 N.E.3d at 143-44.

[14] Russell faults the State for not presenting testimony "by anyone with knowledge about the intricacies of phone accounts and their machinations, about how messages" ended up on two of Timbrook's phones. (Appellant's Br. at 15.) However, Russell does not explain how it was unfair that the trial court admitted the contents of the second phone instead of the first when the two phones were associated with the same phone number and synced automatically

with Apple iCloud. Detective Sellers explained "Apple allows you to log in to your . . . iCloud or your iTunes account on multiple devices." (Tr. Vol. II at 207.) Bobby testified that "when [he] remembered the code both of the phones, the cloud dumped on both of the phones. They just, they came up, okay. And so both phones were identical from what was pulled down from his information on his backups." (*Id*. at 182.) Bobby denied deleting any text messages or manipulating either phone's contents in any way before providing the second phone to law enforcement. He explained that he "one hundred percent" wanted to preserve what was on the phone. (*Id*. at 187.) Thus, we hold the trial court did not abuse its discretion in admitting the text messages extracted from the second phone because there is no indication that those messages were any different from the ones on the first phone.[4]

## 2. Sufficiency of the Evidence

[15] Russell also asserts the State presented insufficient evidence to support his conviction, and therefore, the trial court erred in denying his motion for a

---

[4] Russell also argues the location of the second phone "was totally unknown at the time of Timbrook's death," and he notes Bobby did not give the second phone to law enforcement until weeks later. (Appellant's Br. at 16.) He characterizes this as a "chasm" in the chain of custody. (*Id*.) However, Russell does not assert that the whereabouts of the second phone were unknown once Bobby delivered it to the Zionsville Police Department, and "the rule requiring the State to show a continuous chain of custody or continuity of possession . . . operates . . . only for the period after the evidence comes into the possession of law enforcement personnel." *Arnold v. State*, 436 N.E.2d 288, 291 (Ind. 1982). Therefore, Russell's chain of custody argument fails. To the extent Russell asks us to discount Bobby's testimony that he did not manipulate the contents of the second phone before delivering the phone to law enforcement, such argument is a request for us to reweigh the evidence, which we will not do. *See Minix v. State*, 726 N.E.2d 848, 853 (Ind. Ct. App. 2000) (holding defendant's argument "is an invitation to reweigh the evidence, which we must reject"), *trans. denied*.

directed verdict. The standard of review following denial of a motion for a directed verdict "is essentially the same as that upon a challenge to the sufficiency of the evidence." *Bass v. State*, 947 N.E.2d 456, 459 (Ind. Ct. App. 2011), *trans. denied*. "If the evidence is sufficient to sustain a conviction on appeal, the denial of a motion for directed verdict cannot be error." *Beverly v. State*, 543 N.E.2d 1111, 1114 (Ind. 1989). Our standard of review when evaluating claims of insufficient evidence is well-settled:

> Sufficiency-of-the-evidence claims . . . warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility. Rather, we consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt.

*Powell v. State*, 151 N.E.3d 256, 262-63 (Ind. 2020) (internal citations omitted).

[16] Indiana's drug-induced homicide ("DIH") statute states, in relevant part:

> A person who knowingly or intentionally manufactures or delivers a controlled substance or controlled substance analog, in violation of:
>
> *****
>
> (4) IC 35-48-4-2 (dealing in a schedule I, II, or III controlled substance);

that, when the controlled substance is used, injected, inhaled, absorbed, or ingested, results in the death of a human being who used the controlled substance, commits dealing in a controlled substance resulting in death, a Level 1 felony.

Ind. Code § 35-42-1-1.5(a) (2019). Heroin is an opiate classified as a schedule I controlled substance, Ind. Code § 35-48-2-4(c) (2019), and fentanyl is a schedule II controlled substance. Ind. Code § 35-48-2-6(c) (2019). "Delivery" refers to "an actual or constructive transfer from one (1) person to another of a controlled substance, whether or not there is an agency relationship[.]" Ind. Code § 35-48-1-11 (1990).

[17] The DIH statute "requires the State to prove a causal connection between the controlled substance delivered by the defendant and the victim's death." *Yeary v. State*, 186 N.E.3d 662, 673 (Ind. Ct. App. 2022). The State must prove both that the decedent's death resulted from the drugs the defendant distributed and that the death was reasonably foreseeable. *Id*. at 674. It is reasonably foreseeable that a person who receives a drug will consume it, and therefore, the person's ingestion of the drug is not an intervening cause sufficient to break the chain of causation. *Id*. at 673.

[18] Russell argues the State failed to show Russell "obtained fentanyl (and much less knew it was fentanyl), and that Timbrook ultimately died from the same fentanyl that Mr. Russell obtained." (Appellant's Br. at 19.) Fentanyl is an opiate that is "used in a lot of cases to cut heroin or as a substitute for heroin." (Tr. Vol. II at 245.) Drug traffickers use fentanyl as a substitute for heroin

because it is "cheaper and easier" to obtain than heroin and produces "stronger effects." (*Id*.) Timbrook questioned the quantity of the drugs he received from Russell, texting: "So this is 40 worth[.]" (Ex. Vol. I at 115.) To which Russell responded: "Go easy man. Stuff is wicked strong[.]" (*Id*.) Thus, a reasonable juror could conclude Russell gave Timbrook fentanyl instead of heroin and knew he was doing so because Russell gave Timbrook a lower quantity of drugs than Timbrook expected and warned Timbrook about the drugs' strength. Moreover, while Timbrook texted Russell seeking heroin, no heroin was present in Timbrook's blood at the time of his death. Timbrook also texted Russell that the "stuff is pretty good" less than an hour after receiving the drugs from Russell. (*Id*. at 114.) This evidence permits a reasonable inference that Timbrook overdosed on the drugs he received from Russell.

[19] Russell attempts to distinguish his actions from those prohibited by the DIH statute by arguing that he did not "deliver" drugs to Timbrook within the meaning of the DIH statute. (Appellant's Br. at 20.) In *Weldon v. U.S.,* Judge Richard Posner of the Seventh Circuit observed:

> Suppose you have lunch with a friend, order two hamburgers, and when your hamburgers are ready you pick them up at the food counter and bring them back to the table and he eats one and you eat the other. It would be very odd to describe what you had done as "distributing" the food to him.

840 F.3d 865, 866 (7th Cir. 2016) (vacating the district court's denial of a petition for postconviction relief filed by person convicted of distributing an illegal drug resulting in death and remanding for an evidentiary hearing

regarding whether the petitioner's trial counsel was ineffective in advising him to plead guilty). Russell asserts he "no more delivered nor distributed the drugs to Timbrook than the person who went to the lunch counter to retrieve the hamburgers for the group." (Appellant's Br. at 20.)

[20] However, this argument inaccurately minimizes Russell's role in Timbrook's death. As the State notes, Russell "was an essential link in the chain of delivery between the source of the drugs and Timbrook, the ultimate user of that drug." (Appellee's Br. at 18.) Russell was the only one of the two who knew the supplier's identity and communicated with the supplier. Russell was familiar with the supplier, and when Timbrook wanted heroin, he contacted Russell. Moreover, the State specifically rebutted Russell's position that he was merely a co-purchaser in its closing statement. The State noted Russell texted Timbrook, "Im doing you a favor man." (Ex. Vol. I at 113.) The State observed that text "doesn't sound like a co-purchaser. That sounds like he is getting him the drugs." (Tr. Vol. III at 78.) The State also pointed to Russell's text, "N/c on the skool busses. I felt bad for y so on house tonite." (Ex. Vol. I at 114.) The State argued: "I don't know about you all, but on the house tonight does not sound like a co-purchaser." (Tr. Vol. III at 78.) While Russell invites us to reweigh the evidence in this regard, we will not do so. *See Woodson v. State*, 966 N.E.2d 135, 142 (Ind. Ct. App. 2012) (holding defendant's argument "is little more than a request to reweigh the evidence, which we will not do"), *trans. denied*. Therefore, we hold the State presented sufficient evidence that Russell delivered fentanyl to Timbrook and Timbrook fatally overdosed after ingesting

the fentanyl. *See*, *e.g.*, *Veach v. State*, 204 N.E.3d 331, 338 (Ind. Ct. App. 2023) (holding State presented sufficient evidence to support a conviction under the DIH statute after defendant delivered a lethal dose of fentanyl to the decedent), *trans. denied*.

## Conclusion

[21]   The trial court did not abuse its discretion when it admitted evidence extracted from a phone other than the one found on the counter near Timbrook's body because the contents of both phones was the same given that they were linked to the same iCloud account. In addition, the State presented sufficient evidence that Russell delivered fentanyl to Timbrook and Timbrook died after ingesting that fentanyl. Therefore, we affirm the trial court.

[22]   Affirmed.

Mathias, J., and Bradford, J. concur.